Smith, C. J.
One of the questions which arises as to the distribution of the fund now in court, realized from the sale of the property *13 and franchises of the railroad company, is, shall the trustees under the second and third mortgages executed by said company, be allowed therefrom any compensation for their services, professional or otherwise, as such trustees, or for their expenses incurred about said trust, and for professional services rendered them by Judge Huiick, their attorney in this case.
The facts, so far as they appear from the record and it is necessary to state them, are as follows:
(1st.) The Cincinati & Eastern Railroad Co., which was organized to build a railroad from Cincinnati to Portsmouth, Ohio, on the 26th day of June, 1876, mortgaged all of its property of every description, then owned or thereafter to be acquired, to R. M. Shoemaker and Judge T. Q. Ashburn,fo secure the bonds of said company to the amount of $500,000. This mortgage was duly recorded in all of the counties through which the road runs, in June and July, 1876. Under this mortgage bonds to the amount of $499,100 were actually issued by the company. It provided that on failure by the company, for six months, to pay interest on the bonds, the principal thereof should become due and payable, and that the trustees thereof should take possession of the road, and of all the property mortgaged, and operate it as a railroad, or might foreclose such mortgage and sell the property, if called on to do so by-one-third of the holders of such bonds. It also provided for the mode in which the proceeds should be distributed in case of a sale of the road. The first amounts to be paid were all the reasonable costs, charges and expenses of the trustees named therein, and the proceeds were further to be used to indemnify them against any and all liability incurred by them in the discharge of the duties of their trust.
(2nd.) On the 10th of July, 1880, a second mortgage was executed and delivered by the company to Bishop, as trustee, to secure the payment of other bonds to the amount of $300,-000. This mortgage contained substantially the same provivisions as the first.
(3rd.) On Dec. 1, 1881, a third mortgage was executed by the company to P. F. Swing, as trustee, to secure other’ bonds to the amount of $2,000,000. This also contained like provisions as the first. •
*14 (4fch.) At the time of the decree for the sale of the railroad hereinafter mentioned, there was due, as found by the court, on the bonds secured by the first mortgage, $614,049.81. On those secured by the second mortgage,-$338,710; and on the $558,500 of bonds issued under the third mortgage, there was due the sum of $634,207.
The manner in jwhich the railroad, with the property so mortgaged, was sold, was this: Some years ago, Feike, who was a creditor of the company for a large amount, commenced an action against the company for the recovery of the same, and for the appointment of a receiver to take charge of the mortgaged property, on the ground that ]the company was insolvent, and a receiver was so appointed. To this action all of the parties above named were made parties defendant, or became such. Mr. Storer, a holder of a number of the first mortgage bonds, also became a party defendant, and filed an answer and cross-petition, setting up his claim, and asking a sale of the road to pay the same. Thereupon Judge Swing, as trustee of the third mortgage, filed his answer and cross-petition, setting up his mortgage claim and praying the sale of the mortgaged property, and the application of the purchase-money to the satisfaction of the debts of the company, alleging that he had been requested so to do, by the requisite number of the holders of such third mortgage bonds. After-wards answers and cross-petitions, substantially the same, were filed by the trustees of the first and second mortgages, though ■ it seems that what was subsequently done by the court in ordering the sale, was principally upon the answer and cross-petition of the trustee of the third mortgage.
On July 6, 1886, as shown by the journal entry of that date, the case came on for hearing upon the pleadings, and the court finding the allegations of the cross-petition to be true, and the amounts due on each of the three mortgages as hereinbefore stated, ordered the sale of the road, by the receiver, as a master commissioner. It was sold by him, but did not produce nearly enough to pay the amount due on the bonds secured by the first mortgage.
Application was then made to the court of common pleas for an allowance, from such fund, to the trustees of the second *15 and third mortgages, for their services as trustees, and for legal services of Judge Swing as an attorney in said cause, and for the services of Judge Hulick, who had also appeared as his attorney in this cause. The evidence submitted showed beyond question, that such services had been rendered, and there was no denial by any one that if such trustees were entitled to anything from this fund, that the amounts charged were reasonable and proper. But the trial court held that neither of them was entitled to receive any amount from the proceeds of the sale, under the-facts in the case. Was this right ?
We suppose that the claim on behalf of the trustees might be regarded in a two-fold aspect. 1st, for services as trustees generally, and 2d for services rendered by Judge Swing as an attorney in this case, and for those rendered by Judge Hulick as attorney for such trustees, after Judge Swing himself ceased to have the management of the litigation prosecuted by him.
It is manifest, we think, that his claim under the second head, has more merit than that under the first — for we know of no principle of law, which would entitle a trustee of a junior mortgage, in effect, to call upon the holder of a prior mortgage to compensate him for general services rendered as such trustee.
But it is urged upon us by counsel, that so far as relates to the payment for legal services, rendered in the action, it comes under the well known principle that when in a proceeding in a court of equity, a fund is, by the efforts and at the expense of one of the parties, brought into the court for distribution, that such court, in the interest of justice, should, and will require those who share in the fund, to contribute ratably to the payment of the fees of the counsel for the party, who by his efforts has succeeded in bringing in the fund for distribution.
' There is unquestionably such a principle of law — but it is not, as we understand it, applicable to every case where a fund is so brought into court for distribution. It seems to have well defined limits. The rule, as sanctioned by the supreme court in the case of Mason v. Alexander, 44 Ohio St. 318, is this : that in a proceeding in equity, the object and purpose of *16 which is to bring into court a fund for distribution among creditors, and when the action, if successful, is for the equal-benefit of all the creditors called on to contribute, and no one creditor can ever obtain any advantage or preference over the remaining creditors, but all are to share in the fund pm rata, then the labor of plaintiffs counsel being for the equal benefit of all the creditors, they must all contribute to a reasonable recompense for such services — to be paid from such fund.
This holding was in a case in which a creditor had filed a, petition against the stockholders of an insolvent corporation to enforce their individual liability — and the rule is the same as held in Jameson v. McNally, 21 Ohio St. 298, where a creditor, by action, procures the setting aside of a fraudulent conveyance, which then inures to the equal benefit of all creditors.
But as held in the district court of this county, 1st Law Bulletin IBB, that if there are valid mortages on such property afterwards so fraudulently conveyed, and which conveyance is set aside at the suit of another creditor, the allowance so made to counsel, or any part of it, can not be taken from the shares therein of the mortgage creditors who were in no way benefited by the proceedings, but from the fund which would be coming to such general creditors, for whose benefit the proceedings produced the fund.
In this case, however, the creditors do not stand on the same-footing by any ineans. By virtue of the mortgage, Ashburn and Shoemaker, as trustees, became entitled to a lien on all of the property covered by it, pr^or and superior to the lien of any of the subsequent mortgagees. If therefore, it should appear beyond all question that the sale was made on the cross-petition of the trustee for the third mortgage bond-holders, as we think was the case, and that the trustees of the first mortgage had not also asked for it, and the fund then brought into court for distribution, still it would seem that there is nothing in the rule, as sanctioned by our courts, which would make it equitable or proper for the court to take the money, all of which by virtue of the first mortgage belonged to the trustees named therein, and apply it to the payment of other claims. If there were no preferred claims — if all the creditors *17 stood on the same footing, it would be within the rule and in .accordance with principles of justice and equity to make such allowance from the. fund.
Judge G. W. Hulick, for trustees of second and third mortgages.
<7. B. Matthews, for trustees of first mortgage.
If this were a case of ordinary mortgages, made by one individual to three different persons, and all were to become due and payable, and an action to foreclose were brought by the holder of the third mortgage, against the mortgagor and other mortgagees, and the property sold and the money brought into court, and was not sufficient to pay the first mortgage claim, we know of no practice or principle, which would authorize the court to apply any part of the fund, which would otherwise go to the first mortgagee, to the payment of the fees of the attorney who filed the petition. The rule can not be different here.
In the case of Coe v. Railroad, 10 Ohio St. 372, 409, the supreme court hold expressly that the court cannot allow to the trustee of a railroad mortgage, or to his counsel, fees to be paid from the fund brought into court, after sale made on the application of the trustee. This we suppose must have been for the reason that the mortgage did not so provide; but the report does not give this as the reason. If it did provide (as in this case all of those mortgages do) that in case of a sale, the fund should be applied first to the payment for services of the trustee and his expenses, we think there can be no doubt •but that out of any fund coming to any trustee, his costs should first be paid. But the misfortune here is that there is no fund to go to any one but the trustee of the first mortgage. And while we realize that valuable services have been rendered here by these trustees and their attorney, to whom we would gladly make an allowance if in our power to do so, we think we have no such right, and that the judge of the common pleas should be affirmed.